**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **MAMIE LINDBERG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No.  13-1459-JAR** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of the final decision of Defendant
Commissioner of Social Security denying Plaintiff Mamie Lindberg's applications for a period
of disability and disability benefits under Title II of the Social Security Act,[1] and supplemental
security income benefits under Title XVI of the Social Security Act.[2]   Because the Court finds
that Defendant Commissioner's findings are not supported by substantial evidence, the Court
reverses and remands the decision of Defendant Commissioner.

**I.      Procedural History**

On October 12, 2010, Plaintiff protectively applied for a period of disability and
disability insurance benefits and supplemental security income benefits.  Her applications
claimed an onset date of May 5, 2010.  Plaintiff was last insured for disability insurance benefits
on March 31, 2011.  Plaintiff's applications were denied initially and upon reconsideration.

---

[1] 42 U.S.C. §§ 401–434.

[2] 42 U.S.C. §§ 1381–1383f.

1

Plaintiff timely requested a hearing before an administrative law judge ("ALJ").  After a hearing, the ALJ issued a decision finding that Plaintiff was not disabled; the Appeals Council then denied Plaintiff's request for review of the ALJ's decision.  Plaintiff timely sought  judicial review before this Court.

## II.      Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether Defendant's decision is supported by substantial evidence in the record as a whole and whether Defendant applied the correct legal standards.[3]  The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4]  In the course of its review, the Court may not re-weigh the evidence or substitute its judgment for that of Defendant.[5]

## III.     Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[6]  An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

---

[3]*See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)).

[4]*Id.* (quoting *Castellano*, 26 F.3d at 1028).

[5]*Id.*

[6]42 U.S.C. § 423(d)(1)(A); § 416(i); § 1382c(a)(3)(A).

other kind of substantial gainful work which exists in the national economy."[7]  The Secretary has established a five-step sequential evaluation process to determine whether a claimant is disabled.[8]  If the ALJ determines the claimant is disabled or not disabled at any step along the way, the evaluation ends.[9]

Plaintiff does not challenge the ALJ's determination at step one that Plaintiff has not engaged in substantial gainful activity[10] since May 5, 2010, the onset date.  Nor does Plaintiff challenge the ALJ's determination at step two that Plaintiff has medically "severe" impairments: obesity, seizure disorder, mild thoracic scoliosis with minimal degenerative changes, wrist pain status post remote removal of scar tissue, affective disorder, anxiety disorder, personality disorder, myocardial infarctions status post acute dissection of left anterior descending artery with stenting, history of asthma, and a history of migraines.  Nor does Plaintiff challenge the ALJ's determination at step three that she does not have an impairment or combination of impairments that meet or equal a listing.

But Plaintiff challenges the ALJ's determination of Plaintiff's Residual Functional Capacity (RFC) at step four based on the ALJ's failure to: properly weigh the medical opinions of record, include sufficient social limitations, and adequately consider Plaintiff's statements.

IV.   **Discussion**

A.   *ALJ'S RFC Determination*

---

[7]*Id.* § 423(d)(2)(A); § 1382c(a)(3)(B).

[8]*Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1983).

[9]*Id.*

[10]*See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

The ALJ determined that Plaintiff has the RFC to: perform light work; lift or carry 10 pounds frequently and 20 pounds occasionally; sit, stand or walk for up to six hours in an eight hour workday; frequently handle and finger; not climb ladders, ropes or scaffolds; have occasional exposure to extreme heat or cold, and humidity; avoid excessive vibration, irritants, operational control of moving machinery, unprotected heights and hazardous machinery; have no more than moderate exposure to noise; perform jobs that require some skills but not complex duties; have no public interaction; and work around coworkers but with only occasional interaction with coworkers.

It is the responsibility of the ALJ to evaluate a claimant's RFC.[11]  The RFC represents "the most that the claimant can still do despite her limitations, and must include all of the claimant's medically determinable impairments."[12]  SSR 96-8p[13] requires that the ALJ perform a function-by-function assessment of the claimant's functional limitations and expressly identify the functional limitations or restrictions that affect the claimant's work-related abilities.[14]  The ALJ must consider all the relevant evidence, including the claimant's description of limitations, the medical evidence, and observations of physicians and others.[15]  The RFC is not based solely on medical evidence; rather, it is based on all credible evidence of record, including Plaintiff's

---

[11]*DeWitt v. Astrue*, 381 F. App'x 782, 784 (10th Cir. 2010) (quoting *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008)); SSR 96-8p, 1996 WL 374184, at *1–*2 (July 2, 1996).

[12]*Id.*

[13]SSR 96-8p, 1996 WL 374184 (July 2, 1996).

[14]*See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (finding that where all of the functions the ALJ specifically addressed in the RFC were those in which he found a limitation, a court can reasonably believe that those functions that he omitted were those that were not limited).

[15]*See* 20 C.F.R. § 416.945.

4

medical history and treatment, objective evidence, and Plaintiff's daily activities.[16]

### B.     Treating Physician's and Agency Physicians' RFC Determinations

Plaintiff's treating provider, Dr. Eduardo Austria, completed a Medical Source Statement on February 1, 2012, which opined, consistent with the ALJ's RFC determination, that Plaintiff could lift or carry 10 pounds frequently.  And, in one respect, Dr. Austria's RFC determination was less limiting than that of the ALJ: Dr. Austria opined that Plaintiff could occasionally climb, while the ALJ found that Plaintiff could never climb ladders, ropes, or scaffolds.

But Dr. Austria's opinion departed from the ALJ's RFC determination in several respects.  Dr. Austria opined that: Plaintiff could lift or carry only 10 pounds occasionally, not 20; Plaintiff could sit, stand, or walk only four hours in an eight-hour workday, not six hours in an eight-hour workday; and Plaintiff could never have any exposure to extreme heat or extreme cold, rather than occasional exposure.

Two agency physicians reviewed the records, without examining Plaintiff.  Dr. Karen Sarpolis rendered an opinion on January 28, 2011 that because there was, at that time, no evidence regarding activities of daily living in the file, the evidence was insufficient to determine function.

Agency physician Dr. Carol Eades rendered an opinion on May 13, 2011, that was consistent with the ALJ's RFC determination in some respects.  Specifically, Dr. Eades found that Plaintiff could: frequently lift or carry 10 pounds and occasionally 20 pounds; sit, stand, or walk for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to vibrations, fumes, and irritants; and avoid all exposure to hazards,

---

[16]*See* 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *3.

including machinery and heights.  Dr. Eades's opinion was less limiting than the ALJ's RFC in these respects: she found that Plaintiff could have unlimited exposure to wetness, humidity, and noise, whereas the ALJ determined that Plaintiff could have only occasional exposure to humidity, and only moderate exposure to noise.   And, Dr. Eades's opinion was more limiting in one respect: she opined that Plaintiff must avoid concentrated exposure to extreme heat or extreme cold, while the ALJ found that Plaintiff could have occasional exposure to extreme heat and cold.

The ALJ gave "significant weight" to Dr. Eades's opinion, which she found to be consistent with the medical evidence and Plaintiff's activities of daily living.   The ALJ gave "little weight" to the opinion of Plaintiff's treating physician, Dr. Austria, that Plaintiff could perform less than the full range of sedentary work, because: (1) Plaintiff "demonstrated an ability to sit through the entire one-hour hearing and testified to a greater ability to sit than opined by Dr. Austria; (2) Dr. Austria's opinion is inconsistent with the August 2010 cardiology follow-up note from Dr. Dattilo; and (3) Dr. Austria's opinion is inconsistent with the December 19, 2011, follow-up note of Dr. John Joliff.

Any medical source's opinion of disability or employability is not dispositive.[17]  Final responsibility for determining ultimate issues, such as a claimant's RFC and whether a claimant is disabled, are reserved to the Commissioner.[18]  However, with respect to issues other than the ultimate issues, a treating source's opinion may be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and is not

---

[17]*Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

[18]SSR 96-5P, 1996 WL 374183, at *2 (July 2, 1996).

inconsistent with other substantial evidence in the record; but if the treating source's opinion is "deficient in either respect, it is not entitled to controlling weight."[19]  Of course, even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference."[20]   And, there is a presumption that an examining medical source's opinion is entitled to more weight than the opinion of a medical source who merely reviewed the record.[21]

In evaluating the opinions of medical sources, the ALJ is to use the so-called *Goatcher* factors.[22]  These factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[23]

It is not at all apparent that the ALJ evaluated Dr. Austria's opinion using the *Goatcher* factors.   The record evidences that Dr. Austria was Plaintiff's primary care physician, and

---

[19]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2) and citing SSR 96- 2p, 1996 WL 374188, at *5 (July 2, 1996)).

[20]*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

[21]*Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir.2012) (citing C.F.R. §§ 404.1527(d)(1) and 416.926(d)(1), which are now found, with substantially the same language, at 20 C.F.R. §§ 404.1527(c)(1) and 416.927(c)(1)).

[22]*Goatcher v. U.S. Dep't of Health & Human Services*, 52 F.3d 288, 290 (10th Cir.1995) (citing 20 C.F.R. § 404.1527(d)(2)-(6)).

[23]*Id.*

7

treated Plaintiff from 2009 through 2012.  During this three to four year period, Plaintiff was treated by Dr. Austria on 23 occasions, by this Court's count.  Dr. Austria treated and examined Plaintiff for a variety of symptoms and diseases, including migraines, asthma and respiratory illnesses.  Dr. Austria treated Plaintiff numerous times for pain in her back, shoulder, and elbow. Dr. Austria performed musculoskeletal and neurologic examinations, referred Plaintiff to a neurologist, and prescribed a number of medications and treatments.  In contrast, Dr. Eades reviewed the medical records on May 13, 2011, and rendered an opinion based on the record as of that date.

Moreover, a review of the record reveals that there was evidence supporting Dr. Austria's opinions about Plaintiff's limitations in sitting, standing, walking, lifting, and carrying.  The ALJ found that Dr. Austria's opinion was not supported by Dr. Dattilo's August 20, 2010 follow-up note.  This was a note from Dr. Dattilo to Dr. Austria about Dr. Dattilo's treatment of Plaintiff after she suffered a cardiac arrest in December 2009.   Dr. Dattilo noted that Plaintiff continued to have some atypical pains in her shoulders and chest, as well as some musculoskeletal pains that come and go, but that none of these pains had a cardiac etiology.  The ALJ also found that Dr. Austria's opinion was not supported by a December 19, 2011 note from Dr. John Joliff, who saw Plaintiff for follow-up treatment for coronary artery disease and asthma.  Dr. Joliff noted that Plaintiff was doing well symptomatically and was not having any significant angina.  And, although the ALJ did not point to any other specific evidence in concluding that Dr. Austria's opinions were unsupported by the medical evidence, it is clear that the ALJ considered the medical evidence.  The ALJ discussed at length the findings in a great number of treatment notes

from 2009 to 2012.  While the ALJ is not required to discuss all the evidence,[24] the ALJ  is not to engage in selective reliance upon the medical evidence, but must consider all of the medical evidence in an objective way.[25]  Here, the ALJ selectively considered the evidence.  Notably, while pointing to evidence of normal neurological and musculoskeletal findings on a number of occasions, the ALJ does not mention many other findings that are supportive of Dr. Austria's opinion.  To be sure, a number of examinations revealed that Plaintiff had 5/5 strength in her upper and lower extremities, normal gait, good grip, and good motor strength.

But the ALJ fails to mention a number of occasions where the record reveals abnormal findings or objective evidence supportive of Plaintiff's claims of pain and Dr. Austria's opinion of limitation.  The ALJ does not mention emergency room notes on June 26, 2010, about Plaintiff injuring her back from a "near fall."  Nor does the ALJ mention an August 24, 2011 emergency room visit for a fall that did not result in a fracture, but did result in pain with ambulation and an abnormal gait and stance on that day.   The ALJ also does not mention a September 8, 2011 treatment note indicating that Plaintiff presented with recurrent chest and shoulder pain, swelling in her ankles and feet, and reported that her feet felt numb whenever she stood for more than five minutes at a time.  After this, the doctor ordered a nuclear stress test which returned abnormal findings, as recorded in a September 22, 2011 treatment note of Dr. Joliff.

Nor did the ALJ mention, or apparently consider, the many treatment notes of Dr. Austria

---

[24]*See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.2007) (finding that the ALJ's lack of discussion of all of the factors did not prevent the court from giving meaningful review to the ALJ's decision).

[25]*See Sitsler v. Astrue*, 410 F. App'x 112, 117–18 (10th Cir.2011) ("We have criticized this form of selective and misleading evidentiary review.").

9

that evidence that Plaintiff's asthma sometimes became exacerbated, and was sometimes not quickly responsive to treatment.  In October 2011, Dr. Austria saw Plaintiff three times for asthma after she went to the emergency room for an exacerbation of asthma.

And while mentioning those treatment notes in which Dr. Austria found no significant neurological or musculoskeletal issues, the ALJ did not mention Dr. Austria's treatment notes that evidenced neurological or musculoskeletal issues.  For example, Dr. Austria's examinations found joint stiffness and pain, arthralgia, and localized tenderness in Plaintiff's lower back, shoulder, and elbows in June, July, and October of 2010, March 2011, and February 2012.   In October 2010, Dr. Austria, who had  continued to prescribe a number of pain medications, also did an orthovisc injection to relieve pain in Plaintiff's right elbow.

Plaintiff argues that Dr. Austria's opinion was rendered in merely a checklist form Medical Source Statement on February 1, 2012.  But notably, that same day, Dr. Austria wrote a lengthy treatment note describing Plaintiff's lower back pain, which was "positional worse with bending."  He also described Plaintiffs perilumbar tenderness.  Given Dr. Austria's extensive treatment notes and the fact that many were unmentioned by the ALJ, the Court finds that the ALJ erred in giving "little weight" to Dr. Austria's opinion, while giving "significant weight" to the opinion of Dr. Eades, who merely reviewed records and rendered an opinion on May 13, 2011.

Moreover, in heavily relying upon Dr. Eades's opinion, the ALJ effectively ignored the substantial medical evidence of Plaintiff's condition after May 13, 2011, when Dr. Eades rendered her opinion.  Notably, between Dr. Eades's opinion on May 13, 2011 and Dr. Austria's opinion on February 1, 2012, Plaintiff was treated for exacerbation of asthma on multiple

10

occasions, including an inpatient course of respiratory treatments at Newman Hospital in June

2011.  And, between the time of Dr. Eades's opinion and Dr. Austria's opinion, Plaintiff

continued to have problems associated with her cardiac disease, which were not resolvable by

surgery.  The ALJ failed to mention this evidence.  In December 2009, Plaintiff had suffered a

cardiac arrest in the emergency room, received a cardiac catheterization and stents, and

undergone many months of cardiac rehabilitation thereafter.

And while the ALJ mentioned Dr. Joliff's December 19, 2011 note that Plaintiff was

doing well symptomatically, the ALJ failed to mention that in this treatment note, as well as a

treatment note on September 22, 2011, Dr. Joliff had noted something more serious.  Dr. Joliff

wrote that Plaintiff "has had functional occlusion of the distal left anterior descending artery with

collateralization.  It is hoped that she can continue to do okay on medical management.  This is

not an area that would be amenable to revascularization with a repeat stent or surgery."  In other

words, Dr. Joliff expressed reservations about Plaintiff's cardiac disease because another stent or

surgery would not be possible, and at best they could only continue to treat Plaintiff's symptoms.

Dr. Austria's treatment notes and the other medical evidence of Plaintiff's ongoing

problems with cardiac disease and asthma, as well as back, shoulder, and elbow pain, are

material; this evidence may support limitations in Plaintiff's ability to walk, stand, or lift, as

Plaintiff's strength and stamina may be compromised.  In short, the ALJ erred in selectively

relying upon evidence to accord little weight to Dr. Austria's opinion, while according

significant weight to Dr. Eades's opinion.  The ALJ failed to apply the *Goatcher* factors in

evaluating the opinion of Dr. Austria, Plaintiff's treating physician.  The ALJ gave little

consideration to the fact that Dr. Eades merely reviewed records, and that she did not review any

medical records created after May 3, 2011.  Upon remand, the Commissioner must consider the medical evidence and properly weigh the medical opinions concerning Plaintiff's physical impairments and limitations.

### C.      Evaluating Plaintiff's Credibility

With respect to her evaluation of Plaintiff's physical and mental RFCs, the ALJ also relied upon non-medical evidence, including Plaintiff's subjective complaints.  While the ALJ accepted as credible most of Plaintiff's reports of daily activities, the ALJ found that Plaintiff had exaggerated the extent of her limitations, pain, and other subjective symptoms.  Upon remand, in weighing the opinions of medical sources, and in assessing Plaintiff's physical RFC, the ALJ must reconsider her analysis of Plaintiff's credibility.   For in evaluating the credibility of a claimant's subjective complaints, SSR 96-7p provides that the ALJ is to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how the affect the individual, and any other relevant evidence."[26]  The ALJ's findings as to credibility should be closely and affirmatively linked to substantial evidence.[27]  And, the ALJ must follow the proper legal standards in evaluating Plaintiff's pain testimony, including SSR 96-7p[28] and the factors for evaluation of pain testimony, as required by the Tenth Circuit in *Luna v. Bowen.*[29]

---

[26] SSR 96-7p, 1996 WL 374186 *1 (July 2, 1996).

[27] *Jones v. Astrue*, 500 F. Supp. 2d 1277, 1288–89 (D.Kan. 2007).

[28] SSR 96-7p, 1996 WL 374186 (July 2, 1996).

[29] 834 F.2d 161, 164–66 (10th Cir.1987).

The ALJ pointed to a number of Plaintiff's statements that she perceived to be inconsistent, unsupported, or inaccurate, as proof that Plaintiff's complaints are not fully credible.  From the Court's review of the record, however, it is the ALJ's credibility findings that are inconsistent, inaccurate, or unsupported by the record.  The ALJ discredited Plaintiff because Plaintiff had a sporadic work history with below average wages which suggested that Plaintiff had a low motivation to work.  But the earnings records show that Plaintiff worked every year from 1979 to 2007.  Although her earnings ranged from a low of $751 in 2004 to a high of $15,687 in 1997, her work record could hardly be called sporadic.

The ALJ also discredited Plaintiff for stating that she was unable to afford medication but occasionally received samples from her doctor, since "[t]here is no indication the claimant attempted to obtain medication by applying for reduced cost or free medication from pharmaceutical companies' programs for indigents."  This is not true.  Plaintiff testified that she could not afford her medications, which ran $231 a month, and that her parents had helped her pay for some of her medications.  Plaintiff further testified that she did apply for free medication, but because her parents had helped her in the past, the program declined her application. And ARNP Diane Wilkins noted in a February 10, 2010 treatment note that she had provided Plaintiff with application papers for a patient assistance program.

The ALJ discredited Plaintiff for failing to attend some scheduled mental health appointments; yet there was abundant evidence that Plaintiff has memory problems and struggles to remember appointments.  The ALJ also discredited Plaintiff for being obese and not attempting to diet or exercise; but Plaintiff testified that she was trying to lose weight, and some treatment notes support this.

The ALJ further discredited Plaintiff for testifying that she experienced side effects from medications, yet not listing any side effects when prompted to do so on the form Disability Reports she had completed on March 30, 2011 and June 15, 2011.  To be sure, on these two reports Plaintiff did not disclose any side effects of the medications she listed, except for disclosing her allergic reactions to certain medications.  But during her April 5, 2012 testimony, Plaintiff testified about side effects from nitroglycerine, Imdur and Ranexa.   None of these three drugs were listed on the two disability reports.  Thus, there is no inconsistency between Plaintiff's testimony and the two disability reports.  It is entirely possible that Plaintiff did not start taking these three drugs until some time after these reports in March and June 2011.

Finally, the ALJ stressed that not even Plaintiff believed that she was disabled and incapable of working, citing to Plaintiff's testimony that but for being laid off she would still be working at her previous job, and citing to Plaintiff's testimony that she continued to apply for jobs even after the onset date.  But Plaintiff actually testified that her previous employer laid her off because of her hospitalization and work absences.  When the ALJ asked Plaintiff if she would still be working but for being laid off, Plaintiff's response was equivocal and qualified.  Plaintiff responded that she would "probably" still be working there: "I would hope, if he didn't fire me for being sick."  Plaintiff went on to testify about her past problems with getting fired because of her frequent absences from bronchitis and other illnesses.

The ALJ similarly misconstrued what Plaintiff stated about continuing to apply for work after the onset date.  Plaintiff actually stated, in the March 30, 2011 Disability Report, as follows: "I have been applying for jobs in hopes to get one I can do.  I have had no interview offers, however. . . . Then I wonder if I get a job, will I be able to keep it due to my back,

migraines, asthma/allergies.  I have been fired from previous jobs for missing work due to bronchitis, migraine, etc." And the record certainly supports this testimony that Plaintiff was frequently ill, frequently in emergency rooms, and frequently in doctors' offices.  From 2008 to 2012, by this Court's count, Plaintiff had 31 visits to various emergency rooms, 49 visits to various doctors' offices, and at least three hospitalizations.  Almost half of these emergency room and doctors' office visits occurred after the alleged onset date of May 5, 2010; and Plaintiff had one hospitalization after that date.

In short, there simply is not substantial evidence in the record justifying the ALJ's credibility analysis.  Although this Court is not to re-weigh the evidence, this Court has appropriately reviewed the record and determined that the ALJ 's credibility findings are largely based on inaccurate, incomplete, or inconsistent interpretations of the evidence in the record.

### D.    *Physicians' Opinions On Plaintiff's Mental RFC and Social Limitations*

With respect to Plaintiff's mental RFC, the ALJ concluded that Plaintiff "is limited to jobs that require some skills but not complex duties.  She can have no public interaction.  She can work around coworkers but with only occasional interaction with coworkers."  Plaintiff contends that the ALJ failed to include sufficient social limitations in this RFC.

The ALJ found that Plaintiff has only mild difficulties in social functioning, based on Plaintiff's statements in a March 17, 2011 Function Report, as well as her testimony; based on her treating therapist's January 3, 2011 note; and based on a March 19, 2012 mental health treatment note.  The ALJ also gave "significant weight" to the June 9, 2011 opinion of Dr. Sallye Wilkinson, the state agency psychologist who reviewed the records.  Dr. Wilkinson opined that although Plaintiff struggles with depression, "[t]he alleged extent of limitations appear

15

exaggerated compared to the objective evidence."  Dr. Wilkinson provided some narrative

explanation, primarily focusing on treatment notes from Plaintiff's therapist that indicated that

Plaintiff had made little progress toward her goals of moving out of her parents' house, and

appeared to be exaggerating her symptoms to avoid moving out.  Dr. Wilkinson further

explained that based on Plaintiff's reports of her daily activities of living, Plaintiff's claims about

the extent of her physical problems and depression is not credible.

Plaintiff's therapist, Kerry Lay, stated in a January 3, 2011 treatment note that with

respect to social interaction, Plaintiff was "[h]igh functioning, when she leaves the house."  And

Ms. Lay stated in a May 4, 2011 Narrative Summary treatment note that Plaintiff had been

unable to meet moderate goals, including being more social and getting a job.  Ms. Lay also

expressed concern that Plaintiff "may be exaggerating symptoms, including the un-witnessed

(sic) seizure, because her parents want her to move out and she is afraid to do so."   But in her

March 19, 2012 progress note, Ms. Lay reported a decline in Plaintiff's functioning, when

compared to the January and May 2011 notes.  Ms. Lay continued to express concern that

Plaintiff had made little progress toward her goals, that she suffered from low motivation, and

that therapy had not appeared to help her.  But Ms. Lay also noted more severe limitations in

Plaintiff's social functioning, including that Plaintiff "struggles with extreme distaste for social

interactions.  She is often frustrated or annoyed with normal social interactions and niceties . . .

her social interactions are remarkably problematic.  Ms. Lindberg struggles with feeling

disgusted by the general public and often fails to interact appropriately with people."

While the Court finds that there is not substantial evidence that Plaintiff's social

limitations are mild, the Court finds that the ALJ's limitations in the RFC, of no work with the

public and only occasional interaction with coworkers, are limitations supported by substantial evidence.  As the ALJ discusses, and Dr. Wilkinson notes, Plaintiff's self-reported activities of daily living, as well as the third-party reports from Plaintiff's mother and friend, support that Plaintiff is able to have some limited social interaction despite her feelings of disgust and annoyance with people.  Plaintiff completed a Disability Report dated March 17, 2011, in which she reported that she avoids most social activities, is depressed most of the time, and stays in her room.  Yet, she shops for groceries, an activity that necessarily includes interaction with the public.  Plaintiff also reported that she talks to a friend two to three times a week on the phone.  Plaintiff also reported that she gets along with authority figures "just fine."   Further, in third party disability reports, Plaintiff's friend and Plaintiff's mother reported that Plaintiff was depressed and withdrawn; but they also reported that Plaintiff spends one weekend a month at her friend's house, talks to her friend daily by phone and that Plaintiff connects with her stepchildren over the internet about once a month.   The Court thus concludes that the ALJ did not err in assessing Plaintiff's social functioning.

### V.  Conclusion

For the reasons stated above, the Court concludes that in evaluating Plaintiff's physical RFC, the ALJ improperly weighed the opinions of medical sources and improperly assessed the credibility of Plaintiff's subjective complaints, including pain.  Upon remand, the Commissioner must conduct a proper weighing of medical source evidence and a proper assessment of Plaintiff's credibility in accordance with this opinion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's decision denying Plaintiff disability benefits is **REVERSED AND REMANDED** pursuant to sentence

four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated: <u>January 26, 2015</u>

                                   <u>S/ Julie A. Robinson</u>
                                   JULIE A. ROBINSON
                                   UNITED STATES DISTRICT JUDGE